[No. S004694. Crim. No. 24649. Dec. 20, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDY HASKETT, Defendant and Appellant.

212

220

COUNSEL

William J. Kopeny, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Morris Beatus and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**PANELLI, J.**—Defendant Randy Haskett appeals from the sentence of death imposed on retrial after this court reversed the penalty judgment in *People* v. *Haskett* (1982) 30 Cal.3d 841 [180 Cal.Rptr. 640, 640 P.2d 776] (*Haskett I*). A jury had convicted defendant of attempted second degree murder of his half-sister, Gwendolyn R., and of the first degree murders of her two sons, Keith, age 11, and Cameron, age 4. (Pen. Code, §§ 664/187, 187.)[1] The jury had found true a multiple-murder special-circumstance allegation (former § 190.2, subd. (c)(5)) and imposed the death penalty under the 1977 statute. (See former § 190.1 et seq.; Stats. 1977, ch. 316, §§ 7-13, pp. 1257-1262.) We affirmed the guilt and special circumstance findings but

---

[1] Hereafter statutory references are to the Penal Code unless otherwise indicated.

reversed the sentence of death for *Ramos* error. (*People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908].) On retrial a jury has again imposed the death penalty. This appeal is automatic. (§ 1239, subd. (b); former § 190.4, subd. (e).)

## I.

The prosecution introduced evidence that had been presented at the first trial—both testimonial and physical—tending to show the circumstances of the killings of the two boys and the physical and sexual attack on their mother. The prosecution also introduced evidence of a prior but unrelated sexual attack and beating. In defense, defendant called a number of alibi and character witnesses. The prosecution produced several witnesses in rebuttal, including a psychiatrist to whom defendant had confessed his guilt.

*Prosecution Evidence.* The prosecution evidence relating to guilt may be fairly summarized by reference to this court's summary of the facts in *Haskett I* (*supra*, 30 Cal.3d at pp. 847-848):

"On October 23, 1978, defendant was arrested and charged with rape, robbery, and attempted murder of his half-sister, Mrs. Gwendolyn [R.], and with the first degree murder of her two sons, Keith and Cameron. The key witness for the prosecution was Mrs. [Gwendolyn R.], who testified in substance as follows.

"In the morning hours of October 23, Mrs. [Gwendolyn R.] was awakened when her 11-year-old son Keith returned home after spending the weekend with his grandmother. Her husband had already left for work, but she remained in bed, where her four-year-old son Cameron was also sleeping. Shortly after Keith's arrival, she was awakened again, this time by defendant, who had already entered the house and was apparently in the living room. He identified himself as Randy, and she recognized his voice. He asked her to help him start his car, which he claimed had a dead battery. She responded from the bedroom that she could not help him because she had no cables, but invited him to make himself at home and prepare something to eat.

"A few moments later she heard Keith shout that defendant had cut him. She rushed to the living room, where she saw defendant wielding a kitchen knife and observed blood on her son's hand. Defendant then grabbed her hand and told her not to speak or move. He put the children in the bedroom closet, then demanded that Mrs. [Gwendolyn R.] engage in sex with him. Out of fear, she agreed to capitulate to his sexual demands if he would put

the knife down. He did so, but after intercourse he picked it up again and told her he needed money. Again because she was frightened, she emptied her purse on the bed and gave him the contents, slightly over $30. He handed her a pillow case or towel and told her to wipe all the surfaces in the room that he may have touched. After she had finished, he choked, kicked, and repeatedly stabbed her until she sank to the floor motionless. He covered her with a bedspread and went to the closet. Opening the door, he coaxed the boys out, then killed them both by repeated stabbing.

"To corroborate Mrs. [Gwendolyn R.'s] testimony, the prosecution offered several photographs of the corpses and of Mrs. [Gwendolyn R.'s] wounds, the testimony of police officers that they discovered $30 in the pocket of a shirt lying under the covers of defendant's bed, several items of blood-stained clothing found in defendant's washing machine and elsewhere at his residence, [and] the testimony of a sheriff's office criminalist that there was evidence of semen in Mrs. [Gwendolyn R.'s] vagina shortly after the assault."

As a potential aggravating factor, the prosecution presented evidence of an alleged sexual assault and beating of Mrs. Toni R. in 1977. On the morning of October 7 Mrs. Toni R. went to the mail box a few yards from her apartment door. As she reentered, defendant, who had apparently slipped inside, pulled a sweatshirt over her head and pushed her to the floor. Defendant forced the woman into a bedroom and began to undress. Mrs. Toni R., who was eight months pregnant, became nauseous. Defendant demanded oral sex; the woman protested to all of his demands: "I'm not having sexual relations with my husband, and eight months pregnant at this point, and I'm certainly not going to have it with you." Defendant then grabbed Mrs. Toni R., forcibly took her to the bathroom, wet her hands, rubbed them with soap and, using her hand, massaged his penis. When defendant ordered the woman to undress, she stood up, started praying out loud, and then attempted to escape. He dragged her back by the neck, stating, "Now I am going to kill you or your baby before I leave because you didn't do what I said." As he jumped on her back, punching at her, she crouched in a corner, attempting to ward off the blows to her stomach. At one point his hand passed her mouth; she bit him hard and then screamed.

A neighbor heard the screams and called the police. Moments later Toni R.'s husband arrived home unexpectedly; he was unable to enter because the screen door had been locked by defendant. When the doorbell rang, Mrs. Toni R. screamed repeatedly that a man was trying to rape her. Defendant grabbed his pants and fled through the back door.

Although defendant was chased by the husband and a neighbor, he eluded them and was not apprehended until later in the day when police tracked

down the license number of the vehicle he entered for his escape. The vehicle was registered to Marlene Bell, defendant's girlfriend. Later, in a photographic lineup, Mrs. Toni R. identified defendant as her assailant.

*Defense Evidence.* The defense presented alibi and character witnesses.

Leola Nicholson, defendant's grandmother, testified that defendant was at home with her at the time of the attack on Gwendolyn and the two boys. She had raised defendant after his mother died of cirrhosis of the liver when defendant was four years old. His father had never taken any interest in the boy. The grandmother also testified that defendant had always been an obedient child, had finished the 10th grade and joined the service for a short time, and had been a good father to the 2 children of his "wife," Marlene Bell.

Cora Mays, defendant's older sister, described his impoverished childhood. She also said he was a "normal" child who never got into trouble. She testified that he got along well with children, was good to them, and was not the kind of person to commit the crimes of which he was convicted.

Many friends and neighbors testified to defendant's good character, that he was never in trouble, and that he played with and was good to neighborhood children. Six or more relatives described defendant's kind nature and good habits—no drinking, smoking, or drug taking—and none believed defendant was capable of committing the crimes charged. Several friends and relatives testified to seeing defendant in the neighborhood variously between 7 a.m. and 8:30 a.m. on the day of the killings. An investigator, Curtis Latimore, testified that it took 30 minutes to drive in moderate traffic from the scene of the murders to 70th Street where defense witnesses claimed to have seen defendant at approximately the time of the murders.

It was stipulated that defendant was once a witness to a robbery, assisted police in their investigation, and testified for the prosecution at the preliminary hearing.

Michael Lyons, trial counsel at the first trial, testified that he had thought that a psychiatric defense would be essential and, in aid of that defense, he had advised defendant to tell Dr. Stalberg, a court-appointed psychiatrist, that he had committed the crimes charged. The defense had called Dr. Stalberg as a witness in the first penalty trial.

On cross-examination of Lyons, the prosecution suggested that Lyons was lying about having told defendant to confess to Dr. Stalberg. And on

redirect, the defense sought to establish that Lyons was an inexperienced criminal attorney at the time he represented defendant in the first trial.

*Prosecution Rebuttal Evidence.* A police officer testified that, on the day of the killings, when he called Leola Nicholson in an effort to locate defendant, she became quite excited and asked several times, "What has that boy done now?"

The main rebuttal witness was Dr. Stalberg, who testified that he had been retained by the defense in the prior trial to explore possible psychiatric defenses and that, in the course of an interview, defendant admitted that he went to Gwendolyn's house, engaged in sexual activity with her, stabbed her because he was afraid she would scream, and then stabbed her sons several times. On cross-examination Dr. Stalberg testified that in 1982, at the time of the retrial, he again contacted defendant in jail but refused to participate in the case because defendant no longer admitted culpability for the crimes.

*Instructions and Deliberations.* The trial judge instructed the jury before the closing arguments of counsel. The judge instructed on the factors of aggravation and mitigation in the statutory language (former § 190.3) and added that they "may consider as a mitigating factor any possible doubt as to the defendant's guilt." The jurors were also told: "Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and the instructions with the other jurors." During deliberations the jury received additional instructions on the applicability of certain mitigating factors, on the duty of jurors during deliberations, and on the effect of a deadlocked jury.

## II.

### A. *Mid-deliberation Proceedings.*

Defendant's first two assignments of error relate to proceedings conducted during the deliberations of the jury. Defendant contends that the trial judge, by her mid-deliberation instructions and responses to questions from the jury, withdrew insanity and mental or emotional disturbance as potential mitigating factors. It is also asserted that the trial judge coerced a juror into returning a sentence of death. In order to interpret the proceedings and ascertain the significance and meaning of what was said based on the whole record, we set out the mid-deliberation proceedings as to each contention chronologically and in detail.

## 1. *The Jury Requests for Clarification.*

On the third day of deliberations the court, after consultation with counsel, summoned the jury and responded to three written jury questions as follows:

"Question Number One: 'Is the defendant convicted of premeditated murder?' [Answer:] The defendant was convicted of two premeditated and deliberated murders.

"Question Number Two: 'What happens if we have a split jury?' [Answer:] A mistrial would be declared, and the jury dismissed.

"Question Number Three: 'Do we have to have expert testimony as to mental or emotional disturbance to consider it as a mitigating circumstance?' [Answer:] Mental or emotional disturbance is not always necessarily proved by the testimony of an expert such as a psychiatrist. It may be proved by any other testimonial evidence but not by speculation."

When a juror stated that, as to one of the questions, the judge "had answered it, but I don't think it answers it," the court agreed to reread the answers and suggested that the jury submit additional written inquiry and pinpoint the "unanswered problem." The jury then resumed deliberations.

Two hours later, the jury was back with two further questions. The court indicated that it did not have the answer to the first question and would respond on the following day.[2] The second question was in two parts: "Do a majority of the jurors have the right to examine and cross-examine the minority as to their reasons for a decision?" "Do all jurors have an obligation to continue to discuss the matter if we have not reached a decision?" To this question the court reread two instructions previously given[3] and

---

[2] The first question: "Do we have the option of concluding from the nature of the crimes committed that Randy Haskett may be/is mentally or emotionally disturbed based on the testimony regarding the nature of the crimes?" On the following day, the court informed the jurors that "[t]he attorneys and I have consulted and this is our request: Will you please expand and clarify as much as possible what you have in mind so that we can understand it a little better and answer your question. The minute I receive that, I will be in touch with the attorneys, and we will try to answer it for you." The record contains no further reference to that specific question; apparently the jury did not pursue the matter, nor did the court.

[3] The following two instructions were reread:

CALJIC No. 17.41: "The attitude and conduct of jurors at the beginning of their deliberations are matters of considerable importance. It is rarely productive of good for the juror at the outset to make an emphatic expression of his opinion on the case or to state how he intends to vote. When one does that at the beginning, his sense of pride may be aroused and he

added: "The jury has an obligation to discuss the matter until it arrives at a verdict or it's hopelessly deadlocked." There were no further deliberations on that day.

On the following morning, the fourth day of deliberations, the foreman reported to the bailiff that the jurors were "having a little confrontation" and that "things were getting out of hand." The bailiff in turn reported to the court that he had told the foreman to address the court in writing. Later on the same morning, with defendant, counsel, and the jury present, the court stated: "Mr. Foreman, you sent to the court a note which in effect indicates that the jury is hopelessly deadlocked. If the court were to ask you to continue deliberations, do you think there is any reasonable probability that you might ever arrive at a verdict? [The Foreman:] No, your honor. I don't think at this time that we could." But when asked if "there is anything at all that the court could do further to assist the jury in arriving at any kind of a verdict," the foreman responded, "yes." The court directed the foreman to put in writing whatever it was the court might do to assist the jury.

That afternoon, in chambers with counsel, the court discussed a note from the jury which asked a number of questions and also stated that there was an unwillingness among "some of the jurors" to discuss the case and to go by the evidence. The court dealt first with the allegation that some of the jurors were not acting properly.[4] After discussion, the court denied a prosecution motion to conduct a hearing regarding the jurors who were allegedly acting "improperly," i.e., not following the law.

The court then dealt with the questions contained in the note. The judge summoned the jury into the courtroom and answered the first three questions in the negative: "Should a decision be based entirely on the fact that this would be a deterrent?" "Should we take into consideration that there

---

may hesitate to change his position, even if shown that it is wrong. Remember you are not partisans or advocates in the matter, but are judges."

CALJIC No. 17.40: "Both the people and the defendant are entitled to the individual opinion of each juror. [¶] It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict, if you can do so. Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors. [¶] You should not hesitate to change an opinion if you are convinced it's erroneous. However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision."

[4] In that regard the note read in pertinent part:

"Some of us feel there is not a willingness among some of the jurors to discuss the case and to go by the evidence that has been presented. They are trying to speculate on evidence not presented. There is a doubt in their mind about the sanity of Randy Haskett, which has not been presented in this case."

might be a jail break as part of the reason for making a decision?" "Should we base our decision entirely on the size of the stab wounds?"

To a fourth question, "Is it the duty of the fellow jurors to persuade by verbal force questions and accusations to obtain a common decision?," the court again reread the instructions on the jurors' tasks, the need for individual opinion, and the duty to deliberate. (See fn. 3, *ante*, p. 225.) The court added: " 'Verbal force,' and 'accusations,' as used in question four have no place in your deliberations."

The next question read: "There was to be a question asked of the judge, whether we could consider insanity based on the act of repeated stabbings of the victim." The court answered: "The defendant is presumed to be sane. The jurors cannot consider insanity as a mitigating factor."

The final question of the afternoon was described as a "collective" question: "All twelve jurors need to be further clarified on their obligations as jurors. The instructions as read so far are not considered by the majority to be sufficient. We need to have clarified whether we may use something as a mitigating factor if it has not been proven or substantiated by evidence presented. Can we ignore testimony of witnesses if there is substantial corroborating evidence of that witness's testimony?" The court answered that question as follows: "It is the duty of the jurors to discuss the evidence and not speculate on evidence not presented. Each juror should decide the case for him or herself after a discussion of the evidence and instructions with the other jurors. You may consider pity, sympathy, and mercy in deciding the appropriate penalty. However, you must not be governed by mere conjecture, prejudice or public opinion." At the jury's request, the court sent the reporter to the jury room to reread the questions and answers.

There were no further questions from the jury. On Friday, the fifth day of deliberations, the jury requested a reread of the testimony of Gwendolyn R. And on the following Monday, the jury informed the court that "one juror" refused to discuss the case and disregarded the court's instructions: "We have one juror who continues to use insanity or mental disturbance as a mitigating circumstance even though you, the judge, have said we can't use it. He refuses to discuss the case any more. Is there anything you can do, being he is disregarding your ruling completely?"

Over objection of defense counsel, the court then summoned one of the jurors and conducted the hearing which gave rise to the claim of coercion of verdict, discussed in the following section. At the conclusion of the hearing, the court informed the jury that "there has been no failure on the part of

any juror to follow the court's instructions, and I will ask you to continue your deliberations." On the afternoon of the following day, the jury reached its verdict of death.

▇▇ Defendant asserts that the court's responses to the jury's inquiries withdrew from its deliberation all facts and factors relating to mental or emotional disturbance as mitigation and told the jury that, as a matter of law, it could not consider either insanity *or* mental or emotional disturbance as a factor in mitigation. We disagree.

▇▇ It is well settled that a capital jury may not be precluded " ' "from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." ' . . . [T]he sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.' " (*Skipper* v. *South Carolina* (1985) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6, 106 S.Ct. 1669], citations omitted, italics in original.) (See also *Mills* v. *Maryland* (1988) 486 U.S. 367 [100 L.Ed.2d 384, 108 S.Ct. 1860]; and *McKoy* v. *North Carolina* (1990) 494 U.S. 433 [108 L.Ed.2d 369, 110 S.Ct. 1227] [a jury may not be precluded, by the requirement of unanimity, from considering any mitigating factor].)

*Skipper* was based on the court's earlier decisions in *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954] and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869]. *Lockett* invalidated an Ohio statute which limited mitigating factors to three and did not include consideration of any mitigating aspects of a defendant's character and background. (*Lockett* v. *Ohio, supra*, 438 U.S. at pp. 597-605 [57 L.Ed.2d at pp. 985-990]; see also *Bell* v. *Ohio* (1978) 438 U.S. 637 [57 L.Ed.2d 1010, 98 S.Ct. 2977] [same statute, which limited consideration of mental state to psychosis or mental deficiency (not amounting to insanity) and precluded consideration of mental deficiency because of low intelligence and use of drugs].) *Eddings*, interpreting an Oklahoma statute which provided that in the sentencing proceedings evidence "may be presented as to any mitigating circumstances," held that a sentencer could determine the weight to be given relevant mitigating evidence, but could not, as a matter of law, exclude the evidence from consideration. (*Eddings* v. *Oklahoma, supra*, 455 U.S. at pp. 114-115 [71 L.Ed.2d at p. 11].) ▇▇ We conclude hereafter that the trial judge in the instant case did not violate the dictates of *Lockett* and its progeny—the trial judge did not withdraw from the jury's consideration any factor which was supported by the record or preclude the jury from considering any evidence which had been presented at the trial.

Prior to commencing its deliberations, the jury was advised to consider all of the evidence that had been received during any part of the trial. The

jury was then instructed to "consider, take into account and be guided by the following factors, if applicable: . . . [¶] (A) The circumstances of the crime of which the defendant was convicted in the present proceedings and the existence of any special circumstances found to be true; [¶] . . . [¶] (D) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance; [¶] . . . [¶] (H) Whether or not, at the time of the offense, the capacity of the defendant to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law, was impaired as a result of mental disease or defect or the effects of intoxication; [¶] . . . [¶] (K) Any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death."

At defendant's request, the jury was also instructed: "You may consider pity, sympathy and mercy in deciding the appropriate penalty. However, you must not be governed by mere conjecture, prejudice or public opinion" and "You may consider as a mitigating factor any possible doubt as to the defendant's guilt. A possible doubt may arise after a consideration of all the facts and evidence you may have heard."

It is conceded that defendant proffered *no evidence* of diminished mental capacity or any impaired mental state. Further, it is undisputed that defense counsel did not proffer the evidence of the repeated stabbings as a basis for a sentence less than death; nor did counsel suggest that any inferences should be drawn therefrom as an indication of extreme mental or emotional disturbance or any other state of mind. The closing argument of defense counsel underscored and stressed the evidence of alibi and attacked the credibility of Mrs. Gwendolyn R., pressing for lingering doubt of guilt and asking the jury to show mercy.

From the chronology of the jury's questions related above, we can surmise that the only possible evidence the jury was considering as relating to defendant's mental state was the number of wounds and the manner in which they were inflicted on the victims.[5]

---

[5]The People contend that the nature of wounds and number of stabbings cannot, as such, constitute evidence of emotional disturbance or of any mental state. We stated in *People* v. *Anderson* (1968) 70 Cal.2d 15, 31 [73 Cal.Rptr. 550, 447 P.2d 942] that the manner of killing (brutal hacking) did not support an inference that the act of killing was premeditated rather than hasty and impetuous. In *Haskett I* (*supra*, 30 Cal.3d at p. 850) we agreed with defendant that the method of killing—many stab wounds randomly inflicted—did not in itself establish premeditation and deliberation. In *People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206], we cautioned against giving undue weight to the severity of a victim's wounds in determining whether a killing was committed by means of torture. And in *People* v. *Fields* (1983) 35 Cal.3d 329, 370 [197 Cal.Rptr. 803, 673 P.2d 680], we

Assuming, then, for the purpose of argument that the jury can consider the wounds and manner inflicted as relating to defendant's mental state, we address defendant's first contention—that the trial court's answers to the jury questions improperly removed his mental or emotional state from their consideration. The court's initial instructions relating to defendant's mental or emotional state were given in the statutory language.[6] Only two of the jury's later requests for clarification concerned mental or emotional disturbance. The mid-deliberation question concerning whether it was necessary to have expert testimony to prove mental or emotional disturbance was correctly answered by the judge. Moreover, the question demonstrated that the jury *was* evaluating that mitigating factor. The follow-up question regarding the "nature of the crimes" as evidence of mental disturbance (see *ante*, p. 225, fn. 2) was not resubmitted. And finally the jury's question whether it could "use something as a mitigating factor if it was not proven or substantiated by evidence" graphically illustrates that the jury was making the correct distinction between its right to *consider* a factor in mitigation with its duty to find the factor *inapplicable* if there was a lack of evidence to support it.

In *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190], the court addressed a constitutional challenge to an instruction which purportedly violated the Eighth Amendment requirement that the jury be able to consider and give effect to all relevant mitigating evidence offered by a defendant. At-issue was factor (k) of CALJIC, former No. 8.84.1 which, though not an erroneous instruction, was claimed to be ambiguous and subject to erroneous interpretation. The court stated, "the

---

agreed that proof of criminal acts is insufficient by itself to demonstrate insanity or mental disease or defect.

The foregoing authorities teach that use of wounds or manner of killing has limited value in supplying evidence or inferences of a requisite state of mind, and we find no authority assessing the role played by the nature of wounds or brutality of the crime in the capital *sentencing* function. In our experience, the more brutal the crime the greater the likelihood that it will weigh as aggravating rather than mitigating.

Having said that, however, we recognize that, in a capital case, the jury is given wide latitude to determine the applicability of the various factors which statutorily define its sentencing function (see *People* v. *McDowell* (1988) 46 Cal.3d 551, 577-578 [250 Cal.Rptr. 530, 758 P.2d 1060]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603, 618 P.2d 149]), and we have rejected repeated efforts to rule that the trial court errs when it instructs on inapplicable factors. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250].) In the instant case, the jury could appropriately consider the nature of the wounds as a circumstance of the crime, as an indication of extreme mental or emotional disturbance, or, under the "catchall" factor, as a circumstance which extenuates the gravity of the crime or pertains to any aspect of defendant's character or record.

[6] See former section 190.3; however, the court assigned its own letter designation to the respective factors. The "mental or emotional disturbance" factor was designated (D) (see *ante*, p. 229)

proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." (494 U.S. at p. __ [108 L.Ed.2d at p. 329, 110 S.Ct. at p. 1198].)

The high court found no reasonable likelihood that Boyde's jurors interpreted the instruction in a constitutionally restricted manner, but added: "Even were the language of the instruction less clear than we think, the context of the proceedings would have led reasonable jurors to believe that evidence of petitioner's background and character could be considered in mitigation. Other factors listed in CALJIC No. 8.84.1 allow for consideration of mitigating evidence not associated with the crime itself . . . ." (494 U.S. at p. __ [108 L.Ed.2d at p. 331, 110 S.Ct. at p. 1199].)

Applying the *Boyde* v. *California* standard to these proceedings, we think there is not a reasonable likelihood that the jurors interpreted the court's instructions to prevent consideration of the stabbings, the wounds, or the nature of the crime in mitigation of penalty.

The instruction on mental and emotional disturbance as a mitigating circumstance, like the instruction in *Boyde* v. *California, supra,* 494 U.S. __, is not concededly erroneous. Though it is claimed that the jury misinterpreted it, defendant can point to no instruction or response by the trial court as to that circumstance which could have prompted the note from the jury on the sixth day of deliberations that one juror was using "insanity or mental disturbance as a mitigating circumstance even though you have said we can't use this." Of course, the court had instructed the jury (correctly, we conclude hereafter) that the defendant was presumed sane and that they could not consider *insanity* as a mitigating circumstance.[7]

The jury was instructed to consider all of the evidence received during the trial—evidence of the stab wounds and the manner of killing (testimony and photographs) had been introduced. The jury was instructed on extreme mental and emotional disturbance as a mitigating factor and was told that the evidence of mental or emotional disturbance did not have to be proved by expert testimony. It is inconceivable that the jury would have believed that it *could not consider* that factor. (See *People* v. *Boyde* (1988) 46 Cal.3d 212, 251 [250 Cal.Rptr. 83, 758 P.2d 25].)

---

[7]Unlike the dissent, we distinguish between insanity, incapacity due to mental disease or defect less than insanity, and mental or emotional disturbance. We agree that the court's instruction on the presumption of sanity effectively precluded the jury from considering insanity as a mitigating factor. We address in this part only the question whether the court instructed the jury that it could not consider the nature of the crime or the manner of killing as evidence of mental or emotional disturbance.

Nothing in the court's comments, quoted in their entirety above, could have misled the jury to believe they *could not* consider defendant's emotional or mental state in the deliberation of penalty if the jury found relevant evidence to support that particular mitigating factor. The jurors clearly were in disagreement on whether there was sufficient relevant evidence to find that mitigating factor to be present. And insofar as we cannot determine the precise nature of the conflict among the jurors because of the court's reluctance to inject itself in the dispute over the evidence, we should defer to the court's analysis of the jury's requests as indicating that the jurors were at odds as to whether the evidence warranted application of the mental disturbance factor. The trial court, after all, is in a better position than an appellate court to interpret the tone and nuances of the problems in the jury room. Having presided over the trial, the judge appreciates the full context in which the jury's questions are posed.

■ We also reject defendant's contention that the court's instruction that the defendant was presumed sane and that the jury could not consider insanity as a mitigating factor removed extreme mental or emotional disturbance from the jury's consideration. In this regard, defendant raises two points—(1) the presumption of sanity applies only to the guilt phase and the court erred in instructing thereon in the penalty trial, and (2) the jury was not using the term insanity in its legal sense but as a term of art for a lesser mental state, i.e., mental or emotional disturbance, which the jury could properly consider.

Defendant cites no authority—and we have found none—for the proposition that the presumption of sanity ends at conviction and has no application at the sentencing phase of a criminal trial. In California, insanity cannot be proved at the trial on the issue of guilt. The defense is raised by a separate plea and decided in a separate trial. (See § 1026, subd. (a).) Defendant did not place his sanity at issue; as a result, at the guilt trial he was "conclusively presumed" sane, and evidence tending to prove insanity was inadmissible. (*People* v. *Wells* (1949) 33 Cal.2d 330, 350 [202 P.2d 53].)

Although California's statute enumerating potential mitigating factors in capital cases includes one that permits consideration of evidence of impairment due to mental disease or defect (the trial court's factor (H) in the case at bar; see *ante,* pp. 228-229), that factor clearly contemplates a mental state less than insanity. ■ Under the American Law Institute test, adopted in *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], a person is insane and not responsible for criminal conduct "if at the time of such conduct as a result of mental disease or defect he lacks *substantial* capacity either to appreciate the criminality [wrongfulness] of his conduct

or to conform his conduct to the requirements of law." (Italics added.) The statutorily enumerated mitigating factor which deals with impairment due to mental disease or defect is not the *Drew* definition of insanity, missing an important word, "substantial," and obviously contemplating a lesser impairment of ability to appreciate criminality of conduct.[8]

As noted, no evidence of mental disease or defect was proffered by defendant; the trial court's factor (H) is simply not at issue in the case at bar and defendant does not contend otherwise. The essence of defendant's argument is that the jury was using the term "insanity" not in its legal sense but as a synonym for mental disturbance. However, our review of the record convinces us that the jury was not confusing the two concepts, although, as will appear, the foreman, at least, may have confused the terminology. First, as we illustrated above, there was no error in the instructions which clearly preserved, if applicable, the factor of extreme mental or emotional disturbance as mitigating. Our chronology further reveals that the jurors did have differing opinions as to whether there was any evidence to support an inference of emotional or mental disturbance. This is reflected in the final question asked by the jury concerning their obligations as jurors: "We need to have clarified whether we may use something as a mitigating factor if it has not been proven or substantiated by evidence presented . . . ." The jury was told to discuss the evidence and not speculate on evidence not presented.

Defense counsel, and the dissent, make much of two instances in which the phrase "insanity *or* mental disturbance" was used.[9] (Italics added.)

---

[8] Significantly, the United States Supreme Court, considering the validity of the Ohio statute in *Lockett* v. *Ohio, supra,* 438 U.S. 586, and *Bell* v. *Ohio, supra,* 438 U.S. 637, was not concerned that one of the listed mitigating factor *excluded* evidence of insanity: "The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity." (Ohio Rev. Code Ann. § 2929.04(B) (1975).) The high court was, however, concerned that the listed mitigating factor did not provide for consideration of *lesser* states of mental deficiency.

[9] In one instance, a note from the foreman stated in part: "We have one juror who continues to use insanity or mental disturbance as a mitigating circumstance even though you, the judge, have said we can't use it." (See *ante,* p. 227.) Although the judge had ruled that insanity could not be used as a mitigating factor, *she had at no time indicated that mental disturbance could not be considered as a mitigating circumstance.* On two occasions the jury had asked for advice on the proof required for the mitigating factor of mental disturbance, and the court had twice instructed they could consider that factor based on any evidence other than speculation. The foreman's note appears to acknowledge the court's instruction that mental disturbance "may be proved by any . . . testimonial evidence *but not by speculation.*" (Italics added.)

On a second occasion, during a special hearing on "one juror's" alleged unwillingness to deliberate, the judge asked that juror: "Do you use insanity or mental disturbance as a mitigating circumstance?" See further reference to the judge's comment, *post,* page 237 in the discussion on coercion of the verdict.

There are other comments, by the jurors, however, which indicate that they, singly and collectively, were not confusing insanity and mental or emotional disturbance.[10]

In context and viewing the record as a whole, we are not persuaded that the jury was confused as to the distinctions between the concepts of (1) insanity, which the jury was correctly told not to consider, and (2) a lesser mental state, i.e., extreme mental or emotional disturbance, which they could and did consider. It is evident that what divided the jurors was not whether they could consider defendant's mental state as a mitigating factor but rather whether there was any evidence in the record to support that mitigating factor. It was obvious from the third day of deliberations, when the jury asked if expert testimony was necessary to establish mental state, that the issue troubling them was whether there was any evidence to support that mitigating factor.

The trial judge was keenly aware of the need to remain neutral in the dispute as to whether a particular factor in mitigation was applicable, i.e., whether there was evidence to support application of the factor. The court's comments to counsel indicate that it was alert to the danger that whatever it said could be seen as an interpretation of the evidence and that it was also alert to the requirement that a trial court should not evaluate or assess the mitigating nature of particular items that concern the jury, for fear of unduly coercing the deliberations. (See *People* v. *McDowell, supra*, 46 Cal.3d 551, 578.) In *McDowell* the jury could not agree as to whether certain items of evidence were mitigating. We concluded that the court acted properly in directing the jury to the applicable instructions.

█ Here, too, the court did not err. The trial judge did not tell the jury that evidence from which mental or emotional disturbance might be inferred was irrelevant to the sentencing decision. The trial judge did not, as did the judge in *Eddings* v. *Oklahoma* refuse to consider proffered mitigating evidence. (455 U.S. 104, 112-113 [71 L.Ed.2d 1, 9-10].) Nor was the court and jury encumbered, as was the sentencer in *Lockett* v. *Ohio*, by a statute limiting what might be considered in mitigation. (438 U.S. 586, 607-608 [57 L.Ed.2d 973, 991-992].) The trial judge did not instruct the jury to

---

[10] For example, among the notes sent to the judge just prior to the instruction on the presumption of sanity was one, referred to earlier (*ante*, p. 226, fn. 4), which recognized that defendant's sanity was not an issue in the case. The message to the judge complained that some of the jurors were trying to speculate on evidence not presented: "There is doubt in their mind about the sanity of Randy Haskett, *which has not been presented in this case.*" (Italics added.)

Later, during a special hearing (see *post*, p. 236-237), a juror indicated that he was not considering insanity as a mitigating factor: "I figure if he was, we wouldn't be sitting in here now. If he was judged insane, we would not have had to come in."

disregard or not consider one of the circumstances of the crime—the repeated stabbings—if it found that circumstance applicable to the mental state factor. The trial judge merely stated, and correctly, that the jury had no discretion to conclude that defendant was insane. Accordingly, we find no violation of the dictates of *Lockett*, *Eddings*, and *Skipper*.

Even if, as the dissent asserts, the jury's note to the court on the sixth day of deliberations may have indicated a misunderstanding of the instructions given regarding the mental disturbance factor, other factors listed in CALJIC, former No. 8.84.1, i.e., the "catchall" (factor (k)) as well as the "circumstances of the crime" (factor (a)), would allow for consideration of the evidence of the stabbings and the wounds. ■ As did the court in *Boyde* v. *California*, "we follow the familiar rule stated in *Cupp* v. *Naughten* (1973) 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973): '. . . that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge'" (494 U.S. at p. __ [108 L.Ed.2d at p. 327, 110 S.Ct. at p. 1196]). We conclude that there is no reasonable likelihood that the jury believed it could not consider any and all of the evidence introduced at the penalty phase in mitigation of penalty.

■ As a corollary issue, defendant also urges that the instruction on presumed sanity had the effect of eliminating from the jury's deliberations, as a mitigating factor, any possible lingering doubt as to defendant's sanity and ability to premeditate. He relies on *People* v. *Terry* (1964) 61 Cal.2d 137, 145-147 [37 Cal.Rptr. 605, 390 P.2d 381]. *Terry* is not apposite. In that case, which was also a retrial of the penalty issue only, the trial court did not permit the jury to take into consideration the defendant's theory of the events, i.e., evidence tending to show his possible innocence of the crimes involved in the proceedings.

Here, however, defendant does not charge that the court excluded any proffered evidence. A number of witnesses testified to his alibi, and no claim is made that any specific evidence was offered and rejected. We have determined in the prior discussion that the court did not err in its instructions on the presumption of sanity and the removal of sanity as a factor in mitigation. Inasmuch as sanity was not at issue in this case, at either the guilt or the penalty phase, the court's instruction on the presumption of sanity could not have affected the entirely separate question of whether the jury had any "lingering doubt" as to defendant's guilt.

### 2. *Coercion of Juror Lizana.*

Defendant's second contention is that Juror Roy Lizana was coerced to return a sentence of death. We disagree.

On the sixth day of deliberations, the jury's requests for clarification for the first time focused on a single, allegedly recalcitrant juror. On that day, the jury submitted a question: "We have one juror who continues to use insanity or mental disturbance as a mitigating circumstance even though you, the judge, have said we can't use it. He refuses to discuss the case any more. Is there anything you can do, being he is disregarding your ruling completely?" Following a discussion with counsel and over the objection of defense counsel, the court determined that a hearing was in order to ascertain whether the juror was in fact refusing to deliberate.

The court summoned the jurors and asked them collectively whether there was any among them who felt he or she could not or would not consider the evidence and follow the court's instructions. There was no response. The court then secured from the foreman the name of the allegedly offending juror (Roy Lizana). At this time defense counsel asked the court to determine the numerical division of the jury. The court refused to do so and excused all jurors except Mr. Lizana.

After cautionary warnings concerning the limited nature of the examination it was conducting, the court obtained Lizana's assurance that he was not using *insanity* as a mitigating circumstance and that he was following the court's instructions in that regard. The entire colloquy follows: "[Court:] Mr. Lizana, before I ask you any questions, sir, I want to caution you. I don't want you to give me any of your thinking whatsoever. You have a right to your own private thinking. What I am obligated to go into is the subject matter of the note which indicates that you were considering something as a mitigating factor that I indicated there was no evidence of. Any of your other reasons for what your thinking is are not my concern at this time. They are your own concern. You may have a thousand reasons for any particular way you intend to vote, and those reasons may all be valid reasons. The only problem that I have to find out at this time is are you disregarding the court's instruction that was given to you that Mr. Haskett is presumed sane and that this may not be considered as a mitigating factor. That is all you have to answer. You don't have to answer me another thing. Do you understand? [Lizana:] I understand what you said. That wasn't my idea. That was the question. That was the question they sent in to you. [Court:] That is all I want to know. Then, as far as you are concerned, are you following the court's instruction on this particular point? [Lizana:] Yes, I am. [Court:] That is all I want to know. As far as I am concerned, that is sufficient. But I can only go on what I have heard. Then it's your assurance that you are not using this as a mitigating circumstance and you are following the court's instruction as far as whatever conclusions you have come to; is that correct? [Lizana:] I figure if he was, we wouldn't be sitting in here now. If he was judged insane, we wouldn't

have had to come in. Leave it at that. [Court:] Don't tell me any more. All I want is your assurance. That is sufficient for me."

Though pressed by the prosecution to ask further questions to test Lizana's credibility concerning his alleged refusal to deliberate, as to which the court had not yet questioned Lizana, the court refused, stating that its only concern was whether Lizana was unwilling or unable to follow the court's instruction: "In any other case, somehow I might consider going into a jury deliberative processes, but in this case where we all are aware that any individual who is exercising mercy can hang up a jury, I am not going to go into a situation—if he were hanging up a jury because his sole reason is that he will not follow the court's instructions on a particular point, then I might go into it further. But if he has other reasons on which he is basing his disagreement, and that is what he has represented to me, . . . I would not go into deliberative processes where we have a situation in which an individual, one individual, decides to exercise mercy and question him on that."

Nonetheless, despite its expressed reluctance to question Lizana on his alleged refusal to deliberate, the court recalled Lizana and asked several questions: "Mr. Lizana, relax. This is just to be sure that I understand you. Do you use insanity or mental disturbance as a mitigating circumstance?" Lizana responded, "No, ma'am." The court asked, "Do you refuse to discuss the case with other jurors?" Lizana stated, "No. I never did refuse to deliberate." And to the question, "Are you willing to continue deliberating?," Lizana answered, "I am."

The court thereafter directed the jury to continue deliberating, and on the afternoon of the following day the jury reached its verdict of death.

Defendant urges that the court proceedings in relation to Juror Lizana were fatally coercive. His attack is multifaceted. Not only does defendant question the propriety of conducting a hearing at all, he also asserts that a combination of factors in this case lead to the inevitable conclusion that the juror was coerced. Our review of the record, including the court's conduct and remarks, discloses no impropriety.

In *People* v. *Keenan* (1988) 46 Cal.3d 478 [250 Cal.Rptr. 550, 758 P.2d 1081] we addressed the issue of alleged coercion due to the trial court's remarks during an inquiry into possible juror misunderstanding or misconduct. There, as here, the defendant claimed that, in obviously stressful circumstances, with assertedly only a single juror holding out against the death penalty, certain of the court's remarks unfairly coerced the minority juror. We found no impropriety. The court's comments in the instant case

are even more innocuous than those in *Keenan*, where the alleged recalcitrance concerned ability or willingness to impose the death penalty.

The duty of the court to conduct the inquiry is well settled. (See *People v. Burgener* (1986) 41 Cal.3d 505, 519-520 [224 Cal.Rptr. 112, 714 P.2d 1251] [once a juror's inability to perform his duty is called into question, a hearing to determine the facts is clearly contemplated, and the failure to conduct a hearing is an abuse of discretion]; *People v. Keenan, supra*, 46 Cal.3d 478.) ■ We stated in *Keenan* that "when a trial court learns during deliberations of a jury-room problem which, if unattended, might later require the granting of a mistrial or new trial motion, the court may and should intervene promptly to nip the problem in the bud." (*Keenan, supra*, 46 Cal.3d at p. 532.) We cautioned, however, that "any intervention must be conducted with care so as to minimize pressure on legitimate minority jurors." (*Id.* at p. 533.)

■ Here, the court had ample grounds to conduct an inquiry based upon the foreman's note which suggested that a juror was refusing to perform his duties. Defendant nevertheless maintains that, even assuming that an inquiry was necessary, factors or circumstances peculiar to this case rendered the inquiry inherently coercive. We consider each of the factors and find that, neither singly nor in combination, do they import coercion in the otherwise properly conducted proceeding.

First, defendant states that the trial judge singled out the only holdout juror and suggested to him that he was not obeying his oath *after* the numerical split *and direction of the vote* was known and revealed. Defendant is wrong in several respects. There is no indication that Lizana was the "last, lone, holdout juror" who opposed the death penalty. Indeed, all that was revealed by the foreman's notes to the court was that one juror *allegedly* was not following the court's instructions and was refusing to deliberate.

The numerical split and direction of the vote was not known or revealed. The court was careful to avoid learning the jury's division on the ultimate question of life or death and, as pointed out previously, rejected defense counsel's request to secure the count.

Finally, although both before and during the hearing Lizana was necessarily aware that he was being accused of refusing to perform his duties, at no time was it suggested that he was "disobeying his oath." The court at all times was discreet and sensitive to allay any fears Lizana might have had as to the purpose of the inquiry. The record belies defendant's claims that Lizana was identified and "berated" for not obeying his oath, that the trial judge suggested she "believed" the foreman's note accusing Lizana of

disobeying her orders, and that, by her answers and instructions, the trial judge "implied that she agreed with the jurors who were voting for death." Defendant mischaracterizes the record further when he asserts that the judge's instructions had "the ring of flat orders not to vote for life." To the contrary, the judge's comments expressed a concern not to impose any view on Lizana and indicate that the judge was sensitive and concerned to protect Lizana's right to vote for life on the basis of mercy or for any reason other than insanity.

Unlike in *People* v. *Carter* (1968) 68 Cal.2d 810, 816 [69 Cal.Rptr. 297, 442 P.2d 353], there was no urging of an agreement and no pressuring to reach a verdict. Nor did the judge encourage Lizana to reconsider his position in light of the positions taken by the other jurors, as in *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73]. There is no indication that Lizana opposed a death verdict as such; the dispute among the jurors was clearly focused on the applicability of the factors to be considered in reaching the verdict. We find no impropriety in the manner in which the trial judge conducted the hearing.

The second factor cited by defendant as adding pressure and coercion of verdict was the presence in the courtroom of the family members of the victims when Lizana was subjected to the court's inquiry. Be that as it may, the defendant's family members were also present. We find no relevance in the fact that some members of the victim's family were sitting on the "plaintiff's" side of the courtroom, closest to the jury box. The only case cited by defendant is a Mississippi case (*Fuselier* v. *State* (Miss. 1985) 468 So.2d 45) in which the appellate court found error in permitting the victim's daughter to sit at the prosecutor's table.

The third factor which, it is alleged, tended to coerce Lizana's decision was the knowledge that a prior jury had returned a verdict of death. On voir dire each juror was told that the case had been "sent back to this court on a retrial on the penalty phase only because of some legal errors." That the prior verdict was death was revealed in the course of the trial in comments by the prosecutor, defense counsel, and witnesses. Defendant's grandmother testified, for example, that she was present at the first trial when they "give him the gas chamber." Defendant cites no authority to suggest that knowledge of the prior verdict is necessarily coercive. There was no objection at the trial at any time when the information was revealed. We are persuaded that the jury selection procedures and the instructions given adequately protected against any coercive influence from the knowledge that a prior jury had returned a death verdict.

Fourth, defendant complains that misinformation as to the consequences of a failure to reach a verdict may have swayed Lizana to join the majority.

When the jury had asked, "What happens if we have a split jury," the court replied, "A mistrial would be declared, and the jury dismissed." Defendant urges that the court should have advised, in accord with former section 190.4, subdivision (b), that the defendant would in that circumstance have been sentenced to life without possibility of parole.

We decided this issue contrary to defendant's position in *People* v. *Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803]. We found no error in the trial court's refusal to educate the jury on the legal consequences of a possible deadlock. We also noted the policy reasons for the holding: "[A]ny juror inclined against a finding that death was the appropriate penalty would have realized he could prevail simply by refusing to participate in good faith in the deliberations: by remaining obdurate and causing a jury deadlock, he would have in effect a veto power over the verdict." (*Id.* at p. 515.) (Accord, *People* v. *Bell* (1989) 49 Cal.3d 502, 552 [262 Cal.Rptr. 1, 778 P.2d 129] [also tried under the 1977 death penalty statute].) In *People* v. *Belmontes* (1988) 45 Cal.3d 744 [248 Cal.Rptr. 126, 755 P.2d 310] we likewise found no error in the failure of the court to instruct the jury on the consequences of a deadlock under the 1978 death penalty law.

The final coercive factor, urges defendant, is the court's responses to the jury's inquiry concerning insanity and mental disturbance. The thrust of the argument is that they were coercive because they were erroneous. Having decided that the responses were not erroneous, we reject the contention that Lizana was improperly swayed by the comments.

In sum, we conclude that the court did not err in conducting an inquiry and, further, that the manner in which the inquiry was conducted was not coercive. ▮▮▮▮ Neither singly nor in combination did the factors cited by defendant coerce Juror Lizana to return a verdict of death.[11]

---

[11] Concurring in a suggestion made at oral argument, the dissent states that the examination of Lizana concerning alleged misconduct was improper in that the inquiry invaded Lizana's mental processes. The dissent fails to distinguish between the task of determining *whether* misconduct occurred and the concededly more delicate task of determining the *effect of misconduct* on jurors.

The trial court is empowered to inquire into possible juror misconduct (*Keenan, supra,* 46 Cal.3d at p. 532; *Burgener, supra,* 41 Cal.3d at pp. 519-520), and *In re Stankewitz* (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260] does not hold otherwise. Asking a juror *whether* he or she is following the court's instructions—or using insanity as a mitigating fact, in contravention of the court's instructions—does not implicate the juror's reasoning process. The jury is bound to receive the law as instructed by the judge; the jurors "are not allowed either to determine what the law *is* or what the law *should* be." (*Stankewitz, supra,* 40 Cal.3d at p. 399.)

The rule against inquiring into a juror's mental processes is contained in Evidence Code section 1150. The section applies only "[u]pon an inquiry as to the validity of a verdict . . . ." *In re Stankewitz, supra,* 40 Cal.3d 391, was a petition for writ of habeas corpus, and

### 3. *Remand on Reversal of Judgment for Coerced Verdict.*

Defendant urges this court to adopt a rule that, when a 1977 death penalty case is reversed because of coercion of verdict, the case must be remanded with directions to the trial court to enter a sentence of life without possibility of parole. The rule would apply here, it is suggested, because the trial judge should have declared a hung jury but instead permitted events to exert undue pressure on the jury to reach a verdict.

**(11)** The allegation that the jury was "hopelessly deadlocked," entitling defendant to the benefit of the statutorily mandated sentence of life without parole, is without foundation in the record. A jury may be discharged after submission without reaching a verdict when "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140.) The determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 775 [230 Cal.Rptr. 667, 726 P.2d 113].) The judge did not abuse her discretion when, learning of the impasse, she inquired whether there was anything she could do "to assist the jury in arriving at any kind of verdict." As illustrated above, the trial court exercised its authority without coercion of the jury.

### B. *Testimony of Dr. Stalberg.*

Defendant argues that it was error to admit the testimony of Dr. Stalberg, called as a rebuttal witness by the prosecution over defense objection. Dr. Stalberg had been appointed by the court at defendant's request before the first trial and had been called to the stand by the defense at the penalty phase of that trial. (See *Haskett I, supra*, 30 Cal.3d at p. 868.) At that time, Dr. Stalberg testified that defendant was mildly retarded and capable of rehabilitation. On cross-examination, he stated that defendant suffered from a compulsive sexual disorder. Also, apparently on cross-examination, the doctor testified that defendant admitted that he attacked Mrs. Gwendolyn R. and killed the two children.

---

*People* v. *Guzman* (1977) 66 Cal.App.3d 549 [136 Cal.Rptr. 163] and *People* v. *Hedgecock* (1990) 51 Cal.3d 395 [272 Cal.Rptr. 803, 795 P.2d 1260], cited by the dissent, concerned inquiries made of jurors on motion for new trial. In *Stankewitz*, we determined that certain statements by one juror constituted serious misconduct, but found inadmissible, under Evidence Code section 1150, statements of other jurors that they were not influenced or affected by the alleged misconduct. In *Guzman, supra*, the misconduct was conceded, and the only question addressed by the Court of Appeal was the propriety of discharge and substitution of an alternate juror. In *Hedgecock, supra*, we held that it is within the discretion of a trial court to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct and to permit the parties to call jurors to testify at such a hearing. Neither *Guzman* nor *Hedgecock* stand for the proposition that every answer to a judge's question implicates the answering juror's reasoning process, as asserted by the dissent.

At the second penalty trial Dr. Stalberg was called by the prosecution as a rebuttal witness. Over defense objections, the doctor repeated the testimony about defendant's admissions.

In a multipronged challenge to the admissibility of the doctor's testimony, defendant (1) argues that he received no notice of the prosecution's intent to call Dr. Stalberg, (2) invokes the attorney-client and the psychotherapist-patient privileges, (3) asserts that the admissions were involuntary, and (4) suggests that he was entitled to "use immunity." Defendant did not object to the testimony in the trial court on all of these grounds. We nevertheless discuss each on its merits. We conclude that the court did not err in admitting the doctor's testimony.

1. *Prior Notice.* ■■■ Defendant's claim that he was entitled to notice of intent to call Dr. Stalberg under former section 190.3 of the 1977 penalty statute was raised in the trial court. The trial court overruled the objection on grounds that Dr. Stalberg was being called as a rebuttal witness. In arguing against this claim, the prosecutor contended that he had been "sandbagged" by the defense. He explained that he had not planned to call the doctor; the defense had given him reason to believe that there would be no defense evidence as to guilt at the second penalty trial and that the defense would concentrate on mitigation with background and character evidence. However, as previously noted, the defense did present alibi evidence in an attempt to raise a "lingering doubt" as to guilt.

In view of the defense evidence and claim of alibi, the trial court properly found the doctor's testimony admissible as rebuttal. On request of defense counsel, the court expressly precluded any reference to "any psychiatric aspects," limiting the questioning to the fact that the psychiatrist interviewed defendant and that defendant admitted the offenses.

2. *Privilege.* In the trial court, defendant invoked only the psychotherapist-patient privilege (Evid. Code, § 1010 et seq.). This privilege exists when "the psychotherapist is appointed by order of the court upon the request of the lawyer for the defendant in a criminal proceeding in order to provide the lawyer with information needed so that he or she may advise the defendant whether to enter or withdraw a plea based on insanity or to present a defense based on his or her mental or emotional condition." (Evid. Code, § 1017.)

■■■ The privilege was waived, however, when defendant called Dr. Stalberg to testify on his behalf at the first trial. ". . . Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the

privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege." (Evid. Code, § 912, subd. (a).) Defendant failed to object to *any* of the doctor's testimony at the first trial, effectively waiving the privilege. (See *People* v. *Slocum* (1975) 52 Cal.App.3d 867, 880-881 [125 Cal.Rptr. 442].) The trial court did not err in overruling the claim of privilege.

On appeal, defendant invokes for the first time the attorney-client privilege (Evid. Code, §§ 952, 954) on the mistaken assumption that it has survived the waiver of the psychotherapist-patient privilege. *People* v. *Clark* (1990) 50 Cal.3d 583 [268 Cal.Rptr. 399, 789 P.2d 127], discussing the differences between the psychotherapist-patient privilege and the attorney-client privilege, agreed that statements made to a psychotherapist may be made in the attorney-client relationship and, "unless defendant waived the privilege or did not intend that the statements be confidential, they continued to be privileged notwithstanding the fact that they were no longer confidential at the time of trial." (*Id.* at p. 621.) The defendant's statements in *Clark* were revealed to potential victims and were thus no longer confidential at the time of trial, but in *Clark,* the defendant had at no time waived the privilege.

As the People argue, here defendant did waive the privilege when Dr. Stalberg was called to the stand by the defense in the first trial.

3. *Voluntariness of Admissions.* ■ We reject the contention that the statements were inadmissible for failure to advise pursuant to *Miranda.* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) No objection was made on *Miranda* grounds at either trial, precluding the claim on appeal. (*People* v. *Milner* (1988) 45 Cal.3d 227, 236 [246 Cal.Rptr. 713, 753 P.2d 669]; *People* v. *Jackson* (1989) 49 Cal.3d 1170, 1188 [264 Cal.Rptr. 852, 783 P.2d 211].) Further, the *Miranda* rules apply only to "custodial interrogation"—questioning initiated by, or at the direction of, law enforcement officers—not to questioning by a physician at the request of defense counsel. Here, defendant was represented by counsel who wanted defendant to confer with Dr. Stalberg for his own benefit, and the doctor correctly advised defendant that nothing revealed to the doctor could be used against defendant without the consent of his attorney. There was no violation of defendant's Fifth Amendment rights. (*Estelle* v. *Smith* (1980) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866], upon which defendant relies, is not apposite. There, the accused was faced, while in custody, with a court-ordered psychiatric inquiry without notice to his counsel.)

■ Defendant also urges that the statements were involuntary in the traditional sense—they were coerced by threats of the death penalty. We

reject the argument on procedural grounds and on the merits. First, the doctor's interview with defendant was not state action within the meaning of the due process clause. "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." (*Colorado* v. *Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 484, 107 S.Ct. 515].)

Furthermore, there is no evidence of impermissible coercion in the statements made by Dr. Stalberg in seeking defendant's cooperation to the interview. Dr. Stalberg told defendant that he would be convicted "for sure" and that if he did not confide in the doctor, he would "probably quite likely get the death penalty." Under the circumstances, keeping in mind that the examination of defendant was for the purpose of producing mitigating evidence on his behalf, we find no impropriety in the doctor's attempts to secure defendant's cooperation.

4. *"Use Immunity."* Defendant's final argument regarding the admissibility of the doctor's testimony is obscure. He argues that if we find the confession voluntary and not protected by privilege, we should declare a rule "giving capital defendants a kind of 'use immunity' consistent to that already recognized in analogous situations, that would require exclusion of a confession under the circumstances of the instant case." The crux of the argument appears to be that, inasmuch as defendant did not place his mental state at issue and did not take the stand, any incriminating statements made during the interview should not be admissible. Defendant's argument ignores the fact that it was the defense, not the prosecution, which procured Dr. Stalberg's testimony at the first trial. Defendant cites no compelling reason or authority for fashioning a new rule in this regard. We dismiss the argument for lack of any authority to support it.

In sum, we find no error in the admission of the testimony of Dr. Stalberg, called by the prosecution in the second penalty trial.

C. *Prosecutorial Misconduct*

 Defendant contends that the prosecutor engaged in prejudicial misconduct on numerous occasions during his closing argument. Except in one instance, however, he failed to object at trial to the comments to which he assigns error. He is therefore precluded from challenging those comments on appeal. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609

P.2d 468]; *People* v. *Miranda, supra,* 44 Cal.3d 57, 108; *People* v. *Poggi* (1988) 45 Cal.3d 306, 335 [246 Cal.Rptr. 886, 753 P.2d 1082].)[12]

As to several claims, defendant makes no reference to the record and we are unable to locate the statements of which he complains. As to several, we find no misconduct. And, as will appear, none of the claimed errors was of such significance that it could not have been cured by an admonition. We discuss each instance of claimed misconduct in turn, beginning with that comment to which an objection was made.

1. *Misstatement of Law Regarding Rebuttal Witnesses.* Commenting on the defense witnesses to defendant's good character, the prosecutor stated: "Did I bring in witnesses to say that the defendant wasn't this or wasn't that? . . . So, do you think that I could bring in evidence of someone to say, well, no, he's a bad guy?" The court thereupon sustained a defense objection that the comments were a misstatement of the law—the prosecutor could impeach any witness. The prosecutor conceded that he could impeach a witness and continued with his argument. We see no prejudice to defendant in the passing erroneous comment that was immediately corrected.

2. *Absence of Mitigating Factor as Aggravation.* Although the prosecutor's argument, insofar as it characterized certain absent mitigating factors as aggravating, contravenes *People* v. *Davenport* (1985) 41 Cal.3d 247 [221 Cal.Rptr. 794, 710 P.2d 861], his comments do not constitute prosecutorial misconduct requiring reversal of judgment. A timely objection and admonition could have cured any harm. (*People* v. *Green, supra,* 27 Cal.3d 1, 27.)

Furthermore, any potential for prejudice is minimized when, as in this case, the trial is held under the 1977, not the 1978, death penalty statute. As we stated in *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1034 [248 Cal.Rptr. 568, 755 P.2d 1017], "[t]he 1978 law in effect at the time of *Davenport* directs that the jury impose the death penalty if the jury finds that aggravation *outweighs* mitigation. The 1977 statute did not contain mandatory language and that statute, applicable here, afforded the jury a greater

---

[12]Preliminarily, we reject defendant's argument that the trial court removed from both parties the burden of objecting to improper argument and took that burden upon itself. Defendant relies entirely on a partial comment by the court, made during a recess in the prosecutor's argument, when discussing with counsel how objections should be made during argument: "I feel it's my duty under the cases—and I checked them out at noon . . . ." The phrase, read in context, was clearly not intended to relieve counsel from making appropriate objections. The court stated: "Any objections you have should be taken out of the presence of the jury. If you feel you have to do something in the middle of argument, approach the bench."

latitude to exercise discretion in favor of a sentence of life imprisonment without possibility of parole." (Italics in original.)

3. *Consideration of Sympathy.* ▮▮ Defendant's assertion that the prosecutor argued to the jury that it would be improper to consider sympathy is belied by the record. "It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience." (*Haskett I, supra,* 30 Cal.3d 841, 863; see also *People v. Robertson* (1982) 33 Cal.3d 21, 58 [188 Cal.Rptr. 77, 655 P.2d 279].) Here the court instructed and repeated during deliberations (*ante,* pp. 227, 229) that the jury was to consider pity, sympathy, and mercy in deciding the appropriate penalty. Defendant concedes that the prosecutor told the jury to consider sympathy. The prosecutor's further comments merely urged that the facts of this case did not warrant sympathy. We find no misconduct.

4. *Preference for Death Penalty Under the Law and That "Justice" Demands the Death Sentence.* ▮▮ Defendant does not cite to the record regarding these alleged comments. Independent review of the record reveals nothing. At one point we note that the prosecutor referred to the voir dire and told the jurors they had indicated that "if the evidence under the law indicated that the proper verdict was a death verdict, you could return that death verdict, because that, under a fair, impartial consideration of all the evidence, was the proper verdict." Shortly thereafter, during a recess of argument and outside the presence of the jury, the court stated to counsel: "I did notice Mr. Marin [the prosecutor] used the statement, something something, 'and the law indicates death is proper.' The law has no preference for one penalty or another. I would admonish you not to go back into that." Despite the court's comment, defendant has not persuaded us that the prosecutor made an improper comment, if indeed the court was referring to the statements of the prosecutor which we quote above. Those statements merely reminded the jurors that they had said they could return a death verdict if it was found to be the proper verdict. In any event, the alleged remarks were not objected to, and, if made, would have been capable of correction by timely admonition. (See *Green, supra,* 27 Cal.3d at p. 27.)

5. *Unwarranted Personal Attacks on Defense Counsel.* ▮▮ Defendant points to 22 comments that, it is argued, made defense counsel, not the evidence, the focus of the prosecutor's argument. For example, the prosecutor allegedly told the jury that defense counsel did not want jurors to follow the law, that defense counsel was "dishonest," "tricky," and blasphemous (asking them how Jesus Christ would vote if he were on the jury), that defense counsel misled the jury as to the facts and the law, and

that he was in general disreputable. The argument by both counsel was somewhat acrimonious—defense counsel called the prosecutor the "representative of death"—and the court cautioned counsel on several occasions. We are convinced, however, that none of the incidents, singly or in combination, was of such significance as to constitute prejudicial error.

6. *Argument That Jurors Who Voted for Life Would Be "Ineligible" Jurors and That Jurors Should Not "Hold Out."* Again with no reference to the record, defendant claims that the prosecutor told jurors that they were chosen because they wouldn't "find it difficult" to impose death; he also asserts that the prosecutor told the jurors to conform, not to "hold out," and not to look "carefully" at circumstantial evidence. The alleged comments are not pinpointed in the record, were not objected to, and, if made, were capable of correction by timely admonition. (*Green, supra,* 27 Cal.3d at p. 27.)

7. *Inflammatory Comments, and Appeals to Passion and Prejudice of the Jurors.* ▇▇ Defendant labels inflammatory the invitation of the prosecutor to the jurors to imagine themselves as the victims. The same argument was made and answered after the first penalty trial. (*Haskett I, supra,* 30 Cal.3d at p. 863.) We there concluded that "because of its obvious relevance to a moral assessment of the crime, the prosecution's invitation to the jurors to project themselves into the role of the surviving victim in this case was insufficiently inflammatory to justify reversal. Although the argument no doubt evoked an emotional response, that reaction is attributable more to the gruesome nature of the crime than to the perspective from which it was portrayed." (*Id.* at p. 864.)

▇▇ Defendant also urges that the prosecutor's descriptions of defendant were designed to elicit hostile emotions. For example, ". . . how many of you can really satisfy yourself with coming up with words that sufficiently and fairly describe this man that sits before us now so calm and so cool?"; "Any reasonable, logical person can see what this defendant is, what kind of a person he is. I said I wasn't going to call him any names. You can." There was no objection to any of the above comments, each of which could easily have been muted by admonition. Further, insofar as defendant complains of the reference to defendant's demeanor, there was no error. Reference to courtroom demeanor is not improper during the penalty phase. (*People* v. *Jackson, supra,* 49 Cal.3d 1170, 1206.)

▇▇ Nor is there any merit to defendant's contention that the prosecutor committed misconduct in showing the jury photographs of the victims which had been properly admitted into evidence. In sum, we find no prejudicial error in the conduct of the prosecutor in these regards.

8. *Exploitation of Erroneous Admission of Psychiatrist's Testimony.* We have concluded (*ante*, p. 244) that Dr. Stahlberg's testimony was not erroneously admitted. Accordingly, there was no misconduct in the reference to the doctor's testimony.

9. *Misstatement of Law Concerning Two Reasonable Interpretations of the Evidence.* Regarding the rule that applies when there are two reasonable interpretations of circumstantial evidence (i.e., must accept that most favorable to defendant), the prosecutor stated: "You have two different stories. A jury might think this story showing guilt is reasonable, and the other showing the alibi is reasonable. Then I guess we have to take the one that shows the innocence. We have to vote innocent. That is not true at all, because you can see you have to decide what the true facts are at first." From these comments, defendant speculates that the jury could have believed that the burden of proof was on the defense, rather than the prosecution.

As the People point out, defendant overstates his case. The prosecutor merely noted that the jury serves as the trier of fact; there was no mention of the burden of proof. As to that, the jury had been properly instructed by the court. Further, any potentially misleading aspect of the prosecutor's comments could have been corrected by the court on objection by defendant. We find no error.

D. *Effectiveness of Counsel.*

 Defendant bears the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) To establish constitutionally inadequate representation, the defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been more favorable. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839]; see also *People v. Fosselman* (1983) 33 Cal.3d 572 [189 Cal.Rptr. 855, 659 P.2d 1144]; *Strickland v. Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].) When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" (*People v. Pope, supra*, 23 Cal.3d at p. 426), the contention must be rejected.

On this record, as we illustrate hereafter, defendant has not met his burden to establish the ineffectiveness of trial counsel.

 1. *Testimony of Mrs. Toni R.* ▮▮▮ Defendant faults defense counsel for failing to object to Mrs. Toni R.'s testimony that, during his attack on her, defendant told her to "shut up, all the other girls had done what he wanted and he would hurt me if I didn't do what he wanted." Defense counsel had unsuccessfully attempted to exclude all evidence of the attack on Mrs. Toni R. There is no indication in the record that defense counsel should have anticipated the remark. Once the remark had been made, counsel may have decided not to emphasize the remark by objecting to it. The reason for counsel's omission does not appear in the record. We may therefore reject defendant's claim of ineffective counsel out of hand. (*People* v. *Pope, supra*, 23 Cal.3d at p. 426.) However, to preclude the relitigation of this issue in a habeas corpus petition we discuss the merits.

 Defendant relies on *People* v. *Robertson, supra*, 33 Cal.3d 21, where we found prejudicial error in the admission of a statement implying the commission of "other crimes." Defendant's implied admissions to Mrs. Toni R. that he had committed sexual attacks on "other girls" are somewhat similar to the admissions of the defendant to a witness (Kim P.) in *Robertson* that "he had killed two others." The witness, whose testimony was admitted at the guilt phase only as probative of Robertson's state of mind at the time of the charged killings, testified to sexual assaults against her as well as to Robertson's statement that he had "killed two others." We held that trial counsel failed to render reasonably competent assistance at the guilt phase in not objecting to the statement; we nevertheless affirmed because the evidence against Robertson was overwhelming as to guilt and special circumstances. (*Id.* at pp. 40-42.) We reversed the penalty verdict, however, for failure to give a reasonable doubt instruction with respect to the crimes committed against Kim P. as well as possible additional crimes implied in the statement that he had killed the "two others." (*Id.* at pp. 53-55.)

 In the instant case, even if counsel's representation were deficient in failing to object to the "other girls" remark, we find no prejudice to defendant. The trial court followed the procedures prescribed in *Robertson* (*supra*, 33 Cal.3d at p. 55, fn. 19) to avoid potential confusion over which "other crimes" the prosecution was relying on as aggravating circumstances. The instruction here related specifically to the attacks on Mrs. Gwendolyn R. and Mrs. Toni R. The jury was told to consider those crimes only if they found beyond a reasonable doubt that defendant had committed them. The jury was also told not to consider "any evidence of any other criminal acts or activity as an aggravating circumstance." The "other girls" remark, in our view, was effectively excluded from consideration in the penalty

determination by the court's explicit instruction. Thus, the failure to object did not constitute ineffectiveness of counsel.

2. *Reliance on Alibi Defense.* ▉▉▉ Defendant faults defense counsel for relying on an alibi defense and for presenting any evidence thereon at the second penalty trial. This decision was clearly a tactical choice and not subject to second-guessing by this court. (*People* v. *Ledesma, supra*, 43 Cal.3d at p. 216.) The challenge to counsel on the more specific grounds that counsel should have sought a ruling on the admissibility of Dr. Stalberg's testimony *before* committing himself to a theory of mitigation (alibi) that was incompatible with the confession is only a more oblique attack on the use of the alibi theory of defense in the first place. The reason for counsel's omission does not appear in the record on appeal; we must therefore reject the contention that counsel was ineffective in this regard. (*Id.*, at p. 218.)

3. *Evidence of Low Intelligence.* ▉▉▉ The record does not reveal why defense counsel did not elicit from Dr. Stalberg that defendant had "low intelligence," information to which he had testified in the first penalty trial. The decision not to question the doctor on any of the mental state evidence was entirely consistent with defense counsel's request, granted by the trial court, that Dr. Stalberg not testify to "any psychiatric evidence." The reason for this tactical decision is not of record, however, and cannot serve as a basis for reversal on adequacy-of-counsel grounds.

4. *Mistrial Instruction.* Defendant next contends that counsel should have objected to the court's instruction that the result of a hung jury would be a mistrial. Our conclusion, that there was no error in failing to tell the jury that defendant would be sentenced to life if the jury was unable to agree on a verdict, disposes of this contention. (See *ante,* p. 240.)

5. *Prosecutorial Misconduct.* The only objection at trial to the prosecutor's closing argument was sustained by the trial court. (See *ante,* pp. 244-245.) When the prosecutor responded to the good-character witnesses presented by the defense with the rhetorical question, "So, do you think that I could bring in evidence of someone to say, well, no, he's a bad guy?," defense counsel objected on grounds that the prosecutor was misstating the law and that "He can impeach any witnesses." The court sustained the objection.

▉▉▉ Defendant now suggests that counsel should have objected to comments made immediately thereafter by the prosecutor. The prosecutor agreed that he could impeach a witness. He noted, however, that calling a witness to testify to defendant's bad character does not necessarily impeach

the good-character witness, for a person can have a good reputation with one person and bad reputation with another. Defense counsel urges that the prosecutor's comments suggested he had bad-character witnesses that he did not call. Even if it is conceded that the prosecutor's comments can be interpreted as defendant suggests, on this record we cannot say that defendant was prejudiced by counsel's failure to object. (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 691-692 [80 L.Ed.2d at pp. 695-696].)

CONCLUSION

For the foregoing reasons, the judgment is affirmed.

Lucas, C. J., Eagleson, J., and Arabian, J., concurred.

**MOSK, J.**—I dissent.

As I shall explain, the judgment of death should be reversed because of prejudicial *Skipper* error. (*Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669].) Through certain of its instructions and statements in the course of deliberations, the court improperly precluded the jury from considering in mitigation evidence bearing on defendant's possible insanity or mental or emotional disturbance at the time of the offenses. On this record, the error cannot be deemed harmless.

"[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment, [citation], requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

"This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304-305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (lead opn. of Stewart, Powell and Stevens, JJ.).)

To guarantee that capital sentencing decisions are as individualized and reliable as the Constitution demands, the Eighth Amendment requires that the defendant may not be barred from introducing any relevant mitigating evidence. (*Skipper* v. *South Carolina, supra,* 476 U.S. at pp. 4-8 [90 L.Ed.2d at pp. 6-9]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 112-116 [71 L.Ed.2d 1, 9-12, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 597-

605 [57 L.Ed.2d 973, 985-990, 98 S.Ct. 2954] (plur. opn. by Burger, C. J.); *Bell* v. *Ohio* (1978) 438 U.S. 637, 642 [57 L.Ed.2d 1010, 1016, 98 S.Ct. 2977] (plur. opn. by Burger, C. J.).)

It follows that the Eighth Amendment also requires that a jury and its individual members (*McKoy* v. *North Carolina* (1990) 494 U.S. 433, __-__ [108 L.Ed.2d 369, 378-381, 110 S.Ct. 1227, 1231-1234]) "may not . . . be precluded from considering 'any relevant mitigating evidence.'" (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 4 [71 L.Ed.2d at p. 6] (quoting *Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 114 [71 L.Ed.2d at p. 11]); accord, *McKoy* v. *North Carolina, supra,* 494 U.S. at pp. __-__ [108 L.Ed.2d at pp. 378-381, 110 S.Ct. at pp. 1231-1234]; *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 394, 398-399 [95 L.Ed.2d 347, 350, 352-353, 107 S.Ct. 1821]; *Mills* v. *Maryland* (1988) 486 U.S. 367, 374-375 [100 L.Ed.2d 384, 393-394, 108 S.Ct. 1860].)

Such evidence, of course, includes information relating to insanity and mental or emotional disturbance. (See, e.g., *Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 116 [71 L.Ed.2d at pp. 11-12] [holding that a defendant's "mental and emotional development" at the time of the offense is material in capital sentencing].)[1]

Therefore, when any barrier, whether statutory, instructional, evidentiary, or otherwise (see *Mills* v. *Maryland, supra,* 486 U.S. at pp. 374-375 [100 L.Ed.2d at pp. 393-394]), precludes a jury or any of its members (*McKoy* v. *North Carolina, supra,* 494 U.S. at pp. __-__ [108 L.Ed.2d at pp. 378-381, 110 S.Ct. at pp. 1231-1234]) from considering relevant mitigating evidence, there occurs federal constitutional error, which is commonly referred to as "*Skipper* error." (See generally *Skipper* v. *South Carolina, supra,* 476 U.S. at pp. 4-8 [90 L.Ed.2d at pp. 6-9]; *Hitchcock* v. *Dugger, supra,* 481 U.S. at pp. 394, 398-399 [95 L.Ed.2d at pp. 350, 352-353]; *Mills* v. *Maryland, supra,* 486 U.S. at pp. 374-375 [100 L.Ed.2d at pp. 393-394]; *McKoy* v. *North Carolina, supra,* 494 U.S. at pp. __-__ [108 L.Ed.2d at pp. 378-381, 110 S.Ct. at pp. 1231-1234].)

When the claimed barrier to the jury's consideration of relevant mitigating evidence is an instruction, the crucial question for determining error "is

---

[1] The majority imply that "relevant mitigating evidence" for purposes of the Eighth Amendment includes mental or emotional disturbance *but not insanity.* If they were correct, evidence that merely reduces culpability would be allowed on the crucial Eighth Amendment issue of " 'personal responsibility and moral guilt' " (*People* v. *Marshall* (1990) 50 Cal.3d 907, 938 [269 Cal.Rptr. 269, 790 P.2d 676]), but evidence that totally negates culpability would be barred—surely an untenable result. Contrary to their suggestion, in *Lockett* v. *Ohio, supra,* 438 U.S. 586, and *Bell* v. *Ohio, supra,* 438 U.S. 637, the United States Supreme Court did not validate a statute excluding evidence of insanity. Rather, in those decisions the court *invalidated* a statute even though it *included* evidence of mental states *less than insanity.*

whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of" such evidence. (*Boyde* v. *California* (1990) 494 U.S. 370, __ [108 L.Ed.2d 316, 329, 110 S.Ct. 1190, 1198].)

To conclude that *Skipper* error has in fact occurred, however, does not end the analysis. This error is not automatically reversible, but is subject to harmless-error review under the test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] (hereafter sometimes *Chapman*). (E.g., *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031-1032 [245 Cal.Rptr. 185, 750 P.2d 1342].)

Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].) The "burden of proof" as to prejudice rests on the government. "Certainly error, constitutional error, . . . casts on someone other than the person prejudiced by it a burden to show that it was harmless . . . . [T]he beneficiary of a constitutional error [is required] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid.* [71 L.Ed.2d at p. 710].) When the constitutional error occurred at the penalty phase of a capital trial, the court must proceed with special caution. (See *Satterwhite* v. *Texas* (1988) 486 U.S. 249, 258 [100 L.Ed.2d 284, 295, 108 S.Ct. 1792] [stating that "the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer"].) In such a situation, the "burden of proof" must be deemed very heavy indeed.

I turn to the case at bar. The themes that the People and defendant chose to play throughout the penalty phase were "lingering doubt" and mercy: the People's position was that defendant was indeed the perpetrator of the crimes of which he had been convicted, and that he was undeserving of mercy; defendant's position was the opposite. These themes did *not* include whether or not defendant was insane or mentally or emotionally disturbed.

It became evident from their questions and comments to the court during deliberations that the jury entertained doubts as to whether there was evidence bearing on defendant's possible insanity or mental or emotional disturbance and, more important, whether insanity or mental or emotional disturbance was a circumstance they could consider in mitigation of the penalty of death. The source of the difficulty is apparent.

There was indeed evidence in the record that could support an inference that defendant was insane or mentally or emotionally disturbed: defendant

had always loved children and treated them kindly; nevertheless, he brutally and repeatedly stabbed to death his very own nephews, who were four and eleven years of age.

But as noted, neither the People nor defendant had played the theme of insanity or mental or emotional disturbance. They had chosen "lingering doubt" and mercy instead.

Moreover, the court had not clearly instructed on insanity or mental or emotional disturbance. One penalty factor, it is true, covered "*extreme mental or emotional disturbance.*" (Italics added.) But it was uncertain whether this factor embraced insanity, or even mental or emotional disturbance that was not "extreme." Another penalty factor covered "Any . . . circumstance *which extenuates the gravity of the crime* . . . and any . . . aspect of the defendant's character or record *that the defendant offers as a basis for [a] sentence less than death.*" (Italics added.) But it was uncertain whether this factor encompassed insanity or mental or emotional disturbance: although such conditions could perhaps be said to "extenuate[] the gravity of the crime," none was "offer[ed]" by defendant "as a basis for [a] sentence less than death."

On the first day of deliberations, the jury directed no questions or comments to the court.

On the second day, the jury asked about the phrase "special circumstances," and the court responded that it referred to the multiple murder of defendant's nephews.

On the third day, the jury asked a number of questions, including the following: "Do we have to have expert testimony as to mental or emotional disturbance to consider it as a mitigating circumstance?" In response, the court instructed: "Mental or emotional disturbance is not always necessarily proved by the testimony of an expert such as a psychiatrist. It may be proved by any other testimonial evidence but not by speculation." (Paragraphing omitted.) With apparent reference to the foregoing, one of the jurors stated: "On one question, without going into detail, you answered it, but I don't think it answers it." The court replied: "All I can suggest is that you return to the jury room and be very specific about the unanswered problem, but I am not allowed to discuss anything without consulting the attorneys."

Later that day, the jury asked further questions. The first was: "Do we have the option of concluding from the nature of the crimes committed that Randy Haskett may be/is mentally or emotionally disturbed based on the

*testimony regarding* the nature of the crimes?'' (Italics in original.) The court responded: "I do not have an answer this time to Question Number One. I will have an answer tomorrow morning." (Paragraphing omitted.)

The next morning, on the fourth day, the court stated to the jury: "In relation to Question Number One, Ladies and Gentlemen, the attorneys and I have consulted and this is our request: Will you please expand and clarify as much as possible what you have in mind so that we can understand it a little better and answer your question. The minute I receive that, I will be in touch with the attorneys, and we will try to answer it for you." (Paragraphing omitted.)

Later that morning, the jury directed the following note to the court: "We the jury on the Case of Randy Haskett can not reach a unamious [*sic*] decision." In open court, in the presence of the jury, the court stated: "Mr. Foreman, you sent to the court a note which in effect indicates that the jury is hopelessly deadlocked. If the court were to ask you to continue deliberations, do you think there is any reasonable probability that you might ever arrive at a verdict?" (Paragraphing omitted.) The foreman answered: "No, Your Honor. I don't think at this time that we could." The court then asked: "Is there anything at all that the court could do further to assist the jury in arriving at any kind of a verdict?" The foreman answered: "Yes." The court stated: "If there is, in my opinion, I believe it should be written down and submitted to the court."

That afternoon, the jury directed another note to the court. Contained therein were, among other things, a statement, a question, and a request.

The jury's statement was: "[S]ome of us feel there is not a williness [*sic*] among some of the jurors to discuss the case and to go by the evidence that has been presented. [T]hey are trying to speculate on evidence not presented. [T]here is a doubt in their mind about the sanity of Randy Haskett which has not been presented in this case."

Next, the jury's question—which was evidently the "expansion" or "clarification" of the previous day's "Question Number One" sought by the court—was as follows: "[T]here was to be a question asked of the judge whether we could consider insanity based on the act of repeated stabbings of the victims."

In response, the court instructed: "The defendant is presumed to be sane. The jurors cannot consider insanity as a mitigating factor." The court had earlier informed counsel of this instruction outside the presence of the jury. One of defendant's attorneys had asked, "Would the court consider with

respect to whether the jury can consider insanity or not, amending that to indicate, though they can't consider insanity, they can consider the mental state of the defendant as reflected by any of the evidence in determining which penalty to give?" The court had responded, "No."

Finally, the jury's request was: "All 12 jurors need to be further clarified on their obligation as jurors. The instructions as read so far are not considered by the majority to be sufficient. We need to have clarified whether we may use something as a mitigating factor if it has not been proven or substantiated by evidence presented. Can we ignore testimony of witnesses if there is substantial corroborating evidence to that [sic] witnesses' testimony?"

In response, the court instructed: "It is the duty of the jurors to discuss the evidence and not speculate on evidence not presented. Each juror should decide the case for him[self] or herself after a discussion of the evidence and instructions with the other jurors. You may consider pity, sympathy, and mercy in deciding the appropriate penalty. However, you must not be governed by mere conjecture, prejudice or public opinion." (Paragraphing omitted.)

On the morning of the sixth day, the jury directed yet another note to the court: "We have (1) juror who continues to use insanity or mental disturbance as a mitigating circumstance even though you (the judge) have said, 'we can't use this.' He refuses to discuss the case anymore. Is there anything you can do, being he is disregarding your ruling completely?"

That same morning, the court commented on the note outside the presence of the jury: "The court feels that on the basis of this, that there should be a hearing as to whether or not the juror involved is unable to perform his or her duties so that this court will know whether or not there is good cause to discharge any particular juror."

That afternoon, the court held a hearing with the jury as a whole. It opened by reading the note referred to above. It then asked the jurors if any of them could not or would not consider the evidence and follow the instructions. When no one responded, over defense objection it asked the foreman to identify the juror who was the subject of the inquiry. He named Roy Lizana. It then excused all the jurors except Lizana.

At a hearing with Juror Lizana, the court stated: "What I am obligated to go into is the subject matter of the note which indicates that you were considering something as a mitigating factor that I indicated there was no evidence of." The court elaborated: "The only problem that I have to find

out at this time is are you disregarding the court's instruction that was given to you that Mr. Haskett is presumed sane and that this may not be considered as a mitigating factor." Lizana denied he was disregarding the instruction, albeit somewhat ambiguously. The court asked: "Then, as far as you are concerned, are you following the court's instruction on this particular point?" He answered: "Yes, I am." The court asked: "Then it's your assurance that you are not using this as a mitigating circumstance and you are following the court's instructions as far as whatever conclusions you have come to; is that correct?" He answered: "I figure if he was, we wouldn't be sitting in here now. If he was judged insane, we wouldn't have had to come in. Leave it at that." (Paragraphing omitted.) The hearing closed.

Later that afternoon, the court reopened the hearing with Juror Lizana "just to be sure that I understand you." It asked: "Do you use insanity or mental disturbance as a mitigating circumstance?" He answered, "No, Ma'am." The court summoned the rest of the jurors into the courtroom and announced: "Ladies and Gentlemen, the court finds there has been no failure on the part of any juror to follow the court's instructions, and I will ask you to continue your deliberations."

On the seventh day, the jury returned a verdict of death.

As stated above, *Skipper* error occurred in this case: there is a reasonable likelihood that the jury applied the court's mid-deliberation instructions and statements in such a way as to prevent itself from considering in mitigation evidence bearing on defendant's possible insanity or mental or emotional disturbance.

It clearly appears to have been the court's intent to preclude the jury from considering evidence of insanity or mental or emotional disturbance.

As noted, the court refused defense counsel's request to "amend" its instruction on the conclusive presumption of sanity and the immateriality of insanity "to indicate, though [the jurors] can't consider insanity, they can consider the mental state of the defendant as reflected by any of the evidence . . . ."

That instruction, however, was contrary to federal constitutional law. As noted, under the Eighth Amendment a jury and its individual members (*McKoy* v. *North Carolina, supra,* 494 U.S. at pp. __-__ [108 L.Ed.2d at pp. 378-381, 110 S.Ct. at pp. 1231-1234]) "may not . . . be precluded from considering 'any relevant mitigating evidence.' " (*Skipper* v. *South Carolina, supra,* 476 U.S. at p. 4 [90 L.Ed.2d at p. 6] (quoting *Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 114 [71 L.Ed.2d at p. 11]); accord, *McKoy* v. *North Carolina, supra,* 494 U.S. at pp. __-__ [100 L.Ed.2d at pp. 378-381, 110

S.Ct. at pp. 1231-1234]; *Hitchcock* v. *Dugger, supra,* 481 U.S. at pp. 394, 398-399 [95 L.Ed.2d at pp. 350, 352-353]; *Mills* v. *Maryland, supra,* 486 U.S. at pp. 374-375 [100 L.Ed.2d at pp. 393-394].) Such evidence includes information relating to insanity. (See, e.g., *Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 116 [71 L.Ed.2d at pp. 11-12] [holding that a defendant's "mental and emotional development" at the time of the offense is material in capital sentencing].)

The instruction was also contrary to state statutory law. Under former Penal Code section 190.3 (Stats. 1977, ch. 316, § 11, pp. 1258-1260), which is applicable here, the jury may not be precluded from considering, as a circumstance in mitigation, "Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the affects [*sic*] of intoxication." It follows from the very words of the provision that the jurors may not be barred from taking insanity into account: by definition, a defendant who was insane possessed "capacity" that was "impaired as a result of mental disease . . . ."[2]

Also, under former Penal Code section 190.3, the jury may not be precluded from considering, as a circumstance in mitigation, any "lingering doubt" they might have about the defendant's guilt of the capital offense. The court held as much in *People* v. *Terry* (1964) 61 Cal.2d 137, 145-147 [37 Cal.Rptr. 605, 390 P.2d 381], with regard to former Penal Code section 190.1 (Stats. 1959, ch. 738, § 1, pp. 2727-2728), which is relevantly similar to the provision in question. Neither reason nor authority supports the conclusion that the basis of such "lingering doubt" is of any consequence whatever. It follows that the jury may not be barred from taking into account any "lingering doubt" about guilt based on any factor—including insanity.[3]

Further, when the jury clearly manifested their erroneous belief that they could not consider insanity or mental or emotional disturbance—

[2] The majority argue that mental or emotional disturbance was included in the words of former Penal Code section 190.3, quoted above, but not insanity. They are unpersuasive. Contrary to their implication, the fact that impaired capacity *less than insanity* was relevant to the issue of mitigation under the 1977 death penalty law simply does not support an inference that impaired capacity *amounting to insanity* was otherwise. Of course, for purposes here "mitigation" embraces that which reduces the capital defendant's personal moral culpability. (See former Pen. Code, § 190.3.) To be sure, impairment less than insanity extenuates responsibility to some degree. But impairment amounting to insanity extenuates responsibility further still—and indeed removes it altogether. If the majority were correct, evidence that merely reduces culpability would be allowed, but evidence that totally negates culpability would be barred—surely an untenable result. (Compare fn. 1, *ante.*)

[3] The majority attempt to avoid the holding of *People* v. *Terry, supra,* 61 Cal.2d 137, but are unsuccessful. To be sure, *Terry* did indeed conclude that the exclusion of certain evidence to support a "lingering doubt" of the defendant's guilt of the capital offense was erroneous. But it did so because it first concluded that a defendant's possible innocence of that offense is a mitigating circumstance that the jury may properly consider. (*Id.* at pp. 145-147.)

"We have (1) juror who continues to use *insanity or mental disturbance* as a mitigating circumstance *even though you (the judge) have said, 'we can't use this'*" (italics added)—the court did nothing whatever to correct their misunderstanding.

Finally, in the hearings with the jury as a whole and with Juror Lizana alone, the court effectively instructed that insanity or mental or emotional disturbance could not be considered as a mitigating circumstance. For example, it told Lizana in substance that insanity or mental or emotional disturbance was "a mitigating factor that I indicated there was no evidence of." And it suggested to him that the appropriate response to its question, "Do you use *insanity or mental disturbance* as a mitigating circumstance?" (italics added), was negative.

But whether the court intended to preclude the jury from considering evidence of insanity or mental or emotional disturbance is not dispositive. What is crucial is whether there is a reasonable likelihood that the jury or any of its members was in fact precluded. The answer must be affirmative.

Clear proof that the jury or at least one of its members was precluded from considering evidence of insanity or mental or emotional disturbance is found in the note: "We have (1) juror who continues to use *insanity or mental disturbance* as a mitigating circumstance *even though you (the judge) have said, 'we can't use this.'*" (Italics added.)

Proof clearer still is found in the record of the reopened hearing with Juror Lizana. As noted, the court asked, "Do you use *insanity or mental disturbance* as a mitigating circumstance?" (Italics added.) Lizana answered, "No, Ma'am."

The majority conclude that *Skipper* error did not in fact occur. They claim in substance that insanity is not a material issue at the penalty phase of a capital trial. But as shown, the point founders on the Eighth Amendment as well as former Penal Code section 190.3. They also claim that "insanity" was used and understood by both the court and the jury in its technical legal sense, and not somewhat loosely as denoting mental or emotional disturbance of any degree. But in light of the record set out above—*including the fact that the judge never instructed the jurors on insanity in its technical legal sense*—the assertion is untenable. They then claim that the issue of insanity or mental or emotional disturbance was not before the jury. To be sure, the matter was not raised by the parties. But it was indeed raised—by the jurors themselves. They finally claim that the question with which the jury was concerned during deliberations was not whether they could consider insanity or mental or emotional disturbance as a

mitigating circumstance, but merely whether they could find any evidence in support. But here again, in light of the record set out above, the assertion is untenable.

As also stated, the *Skipper* error in this case cannot be deemed harmless. The People do not even attempt to carry their very heavy burden of proving harmlessness beyond a reasonable doubt. Any attempt, however, would have been unsuccessful. The question of penalty must be considered close. The jury's deliberations on the issue of insanity or mental or emotional disturbance were crucial, difficult, and long: the point is proved by the questions and comments quoted above, and by the fact that the deliberations filled almost 33 hours over 7 days. To be sure, the circumstances of the crimes of which defendant was convicted, together with his prior violent criminal activity, weighed in favor of death. But defendant's possible insanity or mental or emotional disturbance—which is strongly suggested by the fact that although he had always loved children and treated them kindly, he nevertheless brutally and repeatedly stabbed to death his very own nephews—weighed in favor of life. On this record, I am not "able to declare a belief that [the *Skipper* error] was harmless beyond a reasonable doubt." (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 711].)

Because of the result I reach, I need not proceed further in my analysis. One additional point, however, must be made, and made forcefully. The trial judge's examination of one juror, Lizana, was egregiously improper, and calls for the strongest disapproval. As the record set out above establishes, the court's inquiry invaded Lizana's mental processes. Such an inquiry, however, is clearly prohibited. A juror's mental processes are sacrosanct, and may not be opened to scrutiny. (See *In re Stankewitz* (1985) 40 Cal.3d 391, 398 [220 Cal.Rptr. 382, 708 P.2d 1260]; *People* v. *Guzman* (1977) 66 Cal.App.3d 549, 559 & fn. 7 [136 Cal.Rptr. 163] (per Kaus, J.) [stating with persuasive reasoning that such an inquiry "may well" be prohibited]; see also *People* v. *Hedgecock* (1990) 51 Cal.3d 395, 418-419 [272 Cal.Rptr. 803, 795 P.2d 1260] [to similar effect].)

At oral argument the People essentially conceded as much. Subsequently, in a letter brief presented after the cause was taken under submission, the People attempted to withdraw their concession on the "authority" of *People* v. *Eggers* (1947) 30 Cal.2d 676 [185 P.2d 1]. Of course, "It is axiomatic that cases are not authority for propositions not considered." (*People* v. *Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal. Rptr. 724, 462 P.2d 580].) *Eggers* simply did not consider the propriety of a court's inquiry into the mental processes of a juror.

The majority state that "the task of determining *whether* misconduct occurred" is different from "the concededly more delicate task of

determining the *effect of misconduct* on jurors." (Maj. opn., *ante*, at p. 240, fn. 11, italics in original.) But when, as here, the asserted "misconduct" comprises the juror's mental processes, the difference between the two "tasks" is of semantics and not substance. The majority also state that "Asking a juror *whether* he is following the court's instructions—or using insanity as a mitigating fact, in contravention of the court's instructions— does not implicate the juror's reasoning process." (*Ibid.*, italics in original.) They are right. For *the court* to *ask* a juror such a question does not "implicate the juror's reasoning process." But for *the juror* to *answer* does.

Because of the prejudicial *Skipper* error, I would reverse the judgment of death.

Broussard, J., concurred.

**KENNARD, J.**—I respectfully dissent. The trial court's responses to the questions asked by the jury during deliberations erroneously led the jury to believe that it could not consider in mitigation defendant's mental condition at the time he committed the murders. The jury's confusion is clearly demonstrated by a note in which it informed the trial court that one of its members was using defendant's mental state as a mitigating circumstance "even though you, the judge, have said we can't use it." Upon receiving this note, the court was obligated to dispel the jury's confusion on the issue. Its failure to do so was prejudicial error.

There is, of course, no question that a jury deliberating the question of penalty in a capital case must be permitted to consider the defendant's mental or emotional state as a factor in mitigation. The Eighth Amendment to the United States Constitution requires that, before determining whether to impose the death penalty, the jury consider the circumstances relating both to the character and background of the individual offender and the circumstances of the offense. (*Eddings* v. *Oklahoma* (1981) 455 U.S. 104, 112 [71 L.Ed.2d 1, 9, 102 S.Ct. 869].) As the United States Supreme Court recently stated, "a sentencer may not be precluded from giving effect to all mitigating evidence." (*McKoy* v. *North Carolina* (1990) 494 U.S. 433, __ [108 L.Ed.2d 369, 378-379, 110 S.Ct. 1227, 1231]; accord *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6, 106 S.Ct. 1669]; *Mills* v. *Maryland* (1988) 486 U.S. 367, 374-375 [100 L.Ed.2d 384, 393-394, 108 S.Ct. 1860].)

In his penalty phase presentation in this case, defendant attempted to persuade the jury that it should have a "lingering doubt" whether he had committed the murders; he did not rely on mitigating circumstances relating to his mental state at the time of the offenses. Nevertheless, evidence

was presented as part of the prosecution's case-in-chief from which the jury could have reasonably found that defendant was suffering from a mental or emotional disturbance. After raping and trying to kill his half-sister, defendant killed her children by repeatedly stabbing them with a knife. As the majority acknowledges, a jury could consider these unusual facts as evidence that defendant was suffering from a mental or emotional disturbance when he committed the offenses. (Maj. opn., *ante*, p. 229, fn. 5.)

The record shows that during its lengthy deliberations the jury recognized that mental disturbance was potentially a mitigating factor in the case. To ascertain whether it would be proper to consider defendant's mental state as a mitigating circumstance, the jury asked the trial court four questions.[1] These questions, and the court's answers, were as follows:

1. (February 29, 1984.) The jury: "Do we have to have expert testimony as to mental or emotional disturbance to consider it as a mitigating circumstance?" The court: "Mental or emotional disturbance is not always necessarily proved by the testimony of an expert such as a psychiatrist. It may be proved by any other testimonial evidence but not by speculation."

2. (Two hours later.) The jury: "Do we have the option of concluding from the nature of the crimes committed that [defendant] may be/is mentally or emotionally disturbed based on the testimony regarding the nature of the crimes?" The court: "The attorneys and I have consulted and this is our request: Will you please expand and clarify as much as possible what you have in mind so that we can understand it a little better and answer your question. The minute I receive that, I will be in touch with the attorneys, and we will try to answer it for you."

3. (March 1, 1984.) The jury: "There was to be a question asked of the judge, whether we could consider insanity based on the act of repeated stabbings of the victim." The court: "The defendant is presumed to be sane. The jurors cannot consider insanity as a mitigating factor."

4. (March 5, 1984.) The jury: "We have one juror who continues to use insanity or mental disturbance as a mitigating circumstance even though you, the judge, have said we can't use it. He refuses to discuss the case any more. Is there anything you can do, being he is disregarding your ruling completely?" The court questioned this juror individually on two occasions. One of the questions asked was, "Do you use insanity or mental disturbance as a mitigating circumstance?" The juror answered, "No." The next day, the jury returned a verdict imposing the death sentence.

---

[1] The jury also asked a number of other questions, which are set forth in the majority opinion.

These questions and answers indicate that the jury was unsure whether, when the facts of the crimes constituted the only evidence presented of defendant's state of mind, the jury could properly consider in mitigation defendant's mental state at the time of the murders.

The jury's first question focused on the absence of any expert testimony about defendant's mental state, and the trial court correctly informed the jury that expert testimony was not required. But the trial court also told the jury that it could not find mental disturbance based on "speculation." This response apparently did not resolve all of the jury's uncertainties, for it then asked whether it would be proper to infer mental or emotional disturbance from "the testimony regarding the nature of the crimes." The trial court did not understand the thrust of the jury's question, and asked the jury to come back later and "clarify" it.

The majority asserts that the jury never attempted to obtain such "clarification." (Maj. opn., *ante*, p. 225, fn. 2.) I disagree. In its third question, the jury asked whether it could "consider insanity based on the act of repeated stabbings of the victims." This was essentially the same as the previous question, with the word "insanity" substituted for "mental or emotional disturbance." This time, the trial court told the jury that insanity "cannot [be considered] as a mitigating factor" because defendant is "presumed sane."

The majority correctly recognizes that defendant's mental or emotional disturbance could be considered by the jury in mitigation at the penalty phase. It concludes, however, that insanity was not an issue in this case and thus it was proper for the trial court to instruct the jury not to consider insanity in determining penalty. (Maj. opn., *ante*, pp. 231-233.) For the reasons discussed in Justice Mosk's dissenting opinion, I doubt that this is so.

But assuming for argument's sake that the majority is correct, the distinction between insanity, which the jury was precluded from considering, and mental or emotional disturbance, which the jury could consider, is then of critical importance. Yet the trial court never instructed the jury on this point, and the jury's questions reveal that it did not draw such a distinction. As with the first two questions set forth above, the purpose of the third question was to determine whether, based solely on the facts of the offense (as the jury put it, "based on the act of repeated stabbings of the victim"), the jury could infer that defendant was mentally or emotionally disturbed and could consider such disturbance as a mitigating circumstance. From the trial court's answer, a reasonable juror would conclude, erroneously, that it could not do so.

Any doubt in this regard is laid to rest by the fourth question, in which a majority of the jury (apparently 11 of the 12) complained that 1 juror *"continues to use insanity or mental disturbance as a mitigating circumstance even though you, the judge, have said we can't use it."* This communication is significant for two reasons. First, it shows that the jury considered insanity and mental disturbance to be essentially synonymous terms. Second, and most important, it clearly demonstrates that the jury erroneously believed that mental disturbance could not be considered as a mitigating circumstance.

Upon receiving this communication from the jury, it was incumbent upon the trial court to undo the consequences of its earlier instructions and to correct the jury's misconception. Even if the court's original instructions had been correct, once it became aware that the jury was confused as to the law it had a duty to correct the confusion. " 'Just as the law imposes a *sua sponte* obligation to instruct on certain principles of law in the first place (those rules openly and closely connected with the case) so does it impose on the judge a duty to reinstruct on the point if it becomes apparent to [the judge] that the jury may be confused on the law.' " (*People* v. *Vela* (1985) 172 Cal.App.3d 237, 241 [218 Cal.Rptr. 161], quoting *People* v. *Valenzuela* (1977) 76 Cal.App.3d 218, 221 [142 Cal.Rptr. 655].) Here, the jury's communication showed that it had seriously gone astray; the trial court, therefore, was compelled to clarify the matter.

But, far from correcting the jury's misimpression, the trial court's actions had precisely the opposite effect; the court improperly reinforced the notion that the jury could not consider mental disturbance. The court proceeded to question the recalcitrant juror, and specifically asked him whether he was considering insanity or mental disturbance in mitigation. This question hammered home to that juror that the other jurors had correctly interpreted the trial court's instructions, and that the jury could not consider mental disturbance in any form as a mitigating circumstance.

The majority concludes that the jury was not confused. It asserts that "what divided the jurors was not whether they could consider defendant's mental state as a mitigating factor but rather whether there was any evidence in the record to support that mitigating factor." (Maj. opn., *ante*, p. 234.) This analysis is inconsistent with the fourth question set forth above. If the jury was merely involved in a dispute about the sufficiency of the evidence, why did a majority of jurors complain that one juror was refusing to follow the trial court's instructions? The conclusion is inescapable that a majority of the jurors believed the court had instructed them not to consider defendant's mental state as a mitigating circumstance.

The error may not be deemed harmless. "Where original instructions are inadequate, and the jury asks questions indicating their confusion and need for further explanation, failure to give proper additional instructions is usually reversible error. (7 Witkin, Cal. Procedure, [(3d ed. 1985)] Trial, § 305, p. 303.)." (*Sesler* v. *Ghumman* (1990) 219 Cal.App.3d 218, 227 [268 Cal.Rptr. 70].) Here the court's failure to give additional instructions prevented the jury from considering mitigating evidence presented at the penalty phase, an error of constitutional dimension. (*Skipper* v. *South Carolina, supra*, 476 U.S. 1.) The jury's questions demonstrate that it was giving the question of mental disturbance careful consideration.[2] Under these circumstances, it appears "reasonably likely" that the error "may have affected the jury's decision to impose the death sentence." (476 U.S. at p. 8 [90 L.Ed.2d at p. 9].)

I would reverse the judgment of death.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied February 20, 1991. Mosk, J., Broussard, J., and Kennard, J., were of the opinion that the petition should be granted.

---

[2] The law under which this case was tried provided that if the jury had been unable to reach a verdict, retrial would have been barred, and a sentence of life without possibility of parole would have been imposed. (Former Pen. Code, § 190.4, added by Stats. 1977, ch. 316, § 12, p. 1260.) Thus, even if only one juror would have found the evidence of mental disturbance compelling, the death sentence could not have been imposed.